UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LINDA JENNETTE, | : | No. 3:13-cv-01500 (MPS) |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HOUSING AUTHORITY OF THE CITY OF | : | |
|     BRIDGEPORT, | : | |
|     Defendant. | : | May 18, 2015 |

_____

## RULING ON MOTION FOR SUMMARY JUDGMENT

**I.     Introduction**

Plaintiff Linda Jennette ("Jennette") alleges that defendant Housing Authority of the City of Bridgeport ("HACB") discriminated against her on the basis of her disability—Jennette suffers from multiple sclerosis ("MS")—when it terminated her employment in July 2013, in violation of the Rehabilitation Act, 29 U.S.C. §§ 791, 794. HACB disputes that its decision to discharge Jennette was motivated by her disability. HACB has moved for summary judgment, arguing that Jennette has failed to produce sufficient evidence to create a genuine dispute of material fact as to HACB's motivation. The Court disagrees and therefore denies summary judgment on Jennette's claim for discriminatory termination. To the extent that the operative complaint also alleges that HACB violated the Rehabilitation Act by failing to provide Jennette with a reasonable accommodation, summary judgment is granted on any such claim, which has been abandoned and, in any event, would fail as a matter of law.

**II.     Facts**

The following facts are undisputed except as noted at the end of this section:

Jennette has suffered from MS since 1992. In May 2005, Jennette was hired as the executive assistant to the executive director of HACB, which is a municipal housing authority created under state law to provide affordable housing. Between June 2007 and May 2013, HACB's executive director was Nicholas Calace ("Calace"). Between roughly May 15, 2013, and March 3, 2014, HACB was headed by interim executive director Jimmy Miller ("Miller"), who had previously served as executive director and deputy executive director of special projects at the Housing Authority of the City of New Haven ("HANH").

For years, funding to local housing authorities, including HACB, was in decline, which was exacerbated by the "sequestration" of federal funds in 2013. In March 2013, the U.S. Department of Housing and Urban Development notified HACB that federal funding to housing authorities would be cut by thirteen percent. In the 2013 fiscal year (running from October 1 to September 30), HACB had an operating deficit of roughly two million dollars. As a result, Calace began laying off employees: two temporary receptionists and four temporary maintenance workers in March 2013 and two custodians and two certified occupancy specialists in April 2013. When Miller took over, he continued the layoffs: laying off the deputy director of administration in May 2013, a central maintenance coordinator and a senior maintenance administrator in June 2013, and a work order clerk on July 3, 2013.

Amid its budget crisis, HACB began a special project to change its operations from a "centralized operating system" to a "project site based operating system." Hard copies of files at the central office needed to be scanned to be transferred to local sites. On July 11, 2013, human resources director Robyn Stewart ("Stewart") emailed the secretaries and assistants in

the central office to assign them to days during the week of July 15, 2013, when they were to assist with the scanning. Jennette was assigned to scan files on July 19, 2013. Although the office contained desktop scanners that could be used by a person sitting, those machines were not working. The alternative was a large copy machine that a person would stand to use.

Jennette originally thought that the file transfer project entailed physically moving files to new locations. Minutes after receiving Stewart's email, Jennette wrote back to say that she needed her assignment to be on a different day because her immediate supervisor, office manager Eva Miranda ("Miranda") was planning to be on vacation from July 18 to July 26, and Jennette was expected to remain at her desk when Miranda was absent. Stewart replied, "We will work something out, thanks." Stewart and Jennette also had a similar exchange in person. Stewart then assigned another employee to July 19 to cover Jennette's date but did not give Jennette a new assignment.

Within a few days, Jennette became aware that the file transfer project only involved scanning/copying files. On July 15, 2013, Jennette told Stewart that she was worried that her MS would prevent her from standing at the copy machine all day. This was the first time that Jennette had mentioned her MS to Stewart, although Stewart has a faint memory of overhearing Jennette mention her medical condition to other employees years earlier. Stewart told her to get a doctor's note, and Jennette said she would. Later that day, Jennette faxed a note to her neurologist asking for a letter stating that she could not stand all day at the copy machine. Within a day or two, her doctor provided the letter.

The next day, July 16, 2013, Miller called Stewart and instructed her to lay Jennette off. Later that day, Stewart handed Jennette a "notice of job elimination," a letter with form language that had been used for prior layoffs, stating that her employment was ending "[d]ue to

3

Federal funding cuts including sequestration." Exh. 5 to Stewart Aff. In a meeting with Jennette, Stewart explained that her job was eliminated because of the sequestration and budget deficit. Aside from the form letter, there is no contemporaneous documentation of the reasons for Miller's decision to lay off Jennette.

No employee was hired to replace Jennette, and her duties are now performed by Miranda. Since Jennette was laid off, several more employees have also been laid off: a job developer in August 2013, and an elderly/disabled services coordinator, a "Hope VI" coordinator, three administrative assistants, a paralegal, a payroll accountant, and the comptroller, all in September 2013.

The only factual disputes relate to Miller's motivation for laying off Jennette. The parties agree that during her several years with HACB, Jennette was able to perform all her essential duties without accommodation, had a good attendance record, and had no record of disciplinary or performance issues. Jennette alleges that she was chosen to be laid off because of her disability. Second Am. Compl. (ECF No. 11) ("Compl.") ¶¶ 56-57. Miller says that Jennette's MS played no role in his decision and that he was not even aware of her medical condition. Miller Aff. ¶ 23. He says Jennette was laid off because HACB's budget had shrunk, he could not justify having two employees serving as his assistants—in his previous job as executive director of HANH, he had only one employee to perform the tasks of an assistant—and Miranda was the more skilled and efficient of the two. *Id.* ¶¶ 17-22. Jennette disputes those claims, offering her own description of the tasks that she and Miranda performed and depicting Miranda as deficient in many secretarial and office management skills. Jennette Aff. ¶¶ 8-16. She also claims that Miller knew about her communications to Stewart regarding her condition and need for accommodation in relation to the file transfer project, citing the fact that

immediately after she made those communications to Stewart, Stewart met with Miller in his office, with the door closed. Jennette Dep. at 106; Jennette Aff. ¶ 18. Stewart and Miller dispute this. Stewart Aff. ¶¶ 45-49; Miller Aff. ¶¶ 20, 23.

### III.     Legal Standard on Summary Judgment

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting Fed. R. Civ. Pro. 56(a)). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id.* (quotation marks omitted). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted).

**IV.     Discussion**

    **A.     Discriminatory Termination (Disparate Treatment) Claim**

Jennette claims that "[t]he defendant terminated [her] employment because [she] was afflicted with multiple sclerosis," in violation of the Rehabilitation Act, 29 U.S.C. § 794. Compl. ¶¶ 56-57. Because there is a genuine dispute of material fact as to whether HACB discriminated against Jennette by discharging her because of her medical condition, the Court denies summary judgment on this claim.

"The basic framework of a claim of employment discrimination under Section 504 of the Rehabilitation Act" is that a plaintiff "must establish that (1) she is an individual with a disability within the meaning of the Act, (2) she is otherwise qualified to perform the job in question, (3) she was excluded from the job solely because of her disability, and (4) her employer received federal funding." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995). "Under the ADA, a plaintiff must present evidence that animus was a significant factor in the adverse action, whereas to establish a *prima facie* case of discrimination under the Rehabilitation Act, . . . the plaintiff must show that the defendant acted solely because of the disability." *Valenzisi v. Stamford Bd. of Educ.*, 948 F. Supp. 2d 227, 242 (D. Conn. 2013) (quotation marks and modifications omitted); *see also Hodges v. Holder*, 547 F. App'x 6, 8 (2d Cir. 2013) ("In order to establish a *prima facie* case under the Rehabilitation Act, a plaintiff must show that the discrimination occurred 'solely' because of his or her disability.").

"The plaintiff in a Rehabilitation Act suit bears the initial burden of establishing a prima facie case under the Act." *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994). "The burden then shifts to the employer." *Id.* "If the employer asserts a neutral reason, unrelated to plaintiff's handicap, for its employment decision, then its burden is to articulate a

legitimate non-discriminatory reason for discharging the employee." *Id.* (quotation marks omitted). "The burden then shifts back to the plaintiff to show that the employer's stated reason is really a pretext for discrimination." *Id.* Further, on summary judgment, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory" if, for example, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000). "*Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quotation marks omitted).[1]

Motivation ("solely because of her disability") is the only element of Jennette's case that HACB has challenged. Def.'s Br. at 9. As HACB has articulated a non-discriminatory reason for discharging Jennette—namely, its budget crisis in combination with Miranda's superior skills and efficiency—Jennette must produce sufficient evidence to create a genuine dispute of material fact as to whether, in truth, HACB discharged her "solely because of her disability." She has done so.

---

[1] Although *Reeves* and *Schnabel* involved claims under the Age Discrimination in Employment Act ("ADEA") rather than the Rehabilitation Act, they elaborate the burdens generally applicable to disparate-treatment discrimination cases (established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)), which extend to Rehabilitation Act claims. *See, e.g.*, *Doe v. Bd. of Educ. of Fallsburgh Cent. Sch. Dist.*, 63 F. App'x 46, 48 (2d Cir. 2003) ("Claims under the ADA, the Rehabilitation Act, and the NYHRL all proceed under the familiar burden-shifting analysis articulated by *McDonnell Douglas* and its progeny.").

Jennette does not dispute that the budget crisis was HACB's motivation for laying off *someone*. Pl.'s Br. at 11. Rather, she contends that, in choosing whether to lay off Jennette or Miranda, Miller chose Jennette because of her disability and her request for accommodation, and Miller's claims to the contrary are pretextual. This is a cognizable claim, even under the "solely because of" standard. *See Borkowski*, 63 F.3d at 143 (Rehabilitation Act case) ("Employees with disabilities would not, for example, be insulated from a layoff accompanying an economic downturn, *provided* that the employer did not select the employees to be discharged in a discriminatory manner.") (emphasis added).

Jennette produces pieces of evidence that, taken together, create a genuine dispute of material fact as to pretext, even though none of the pieces individually would. First is the evidence that Miller was made aware of Jennette's MS and accommodation request on July 15, 2013, and then laid her off the *next day*. It is undisputed that Jennette informed Stewart of her MS and made the request for an accommodation on July 15 and that Jennette was discharged on July 16. Jennette's testimony that Stewart met with Miller in private immediately after hearing from Jennette is circumstantial evidence that would permit a reasonable jury to infer that Miller was also made aware of Jennette's MS and accommodation request at that time. *Cf. Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("A jury . . . can find retaliation even if the [corporate] agent denies direct knowledge of a plaintiff's protected activities . . . so long as the jury finds that the circumstances evidence knowledge of the protected activities . . . .").

Such a close temporal connection between Miller's learning of Jennette's MS and accommodation request and his laying her off is evidence of pretext, even though it is not enough on its own to defeat summary judgment. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d

8

834, 847 (2d Cir. 2013) ("[T]emporal proximity between her protected conduct and her termination . . . alone is insufficient to defeat summary judgment at the pretext stage. However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage.") (citations omitted).

There are also potential inconsistencies in HACB's descriptions of the process by which Jennette was chosen to be laid off, which could provide further support for a jury finding of pretext.[2] Stewart testified in her deposition that in June, Miller's New Haven assistant[3] communicated to Stewart that "Mr. Miller wanted to know what does Linda [Jennette] exactly do, because he was going to eliminate the position if we can't justify the amount of work that she's doing." Stewart Dep. at 16; *see also* Stewart Aff. ¶ 36. But that testimony is at odds with the claim, made by both Stewart and Miller in their affidavits, that Stewart had no involvement in the decision to lay off Jennette. Stewart Aff. ¶ 50 ("I did not directly or indirectly recommend, suggest or induce Mr. Miller to eliminate the plaintiff's job position or to lay her off. Nor did I influence in any way or attempt to influence his decision to do so."); Miller Aff. ¶ 21 ("Neither Human Resources Director Stewart nor Office Manager Miranda influenced in any way my decision to eliminate the plaintiff's position and lay her off."). It is also in tension with the undisputed fact that Stewart emailed Jennette on July 11 to assign her a project to be completed on July 19, and then instructed Jennette on July 15 to request a letter from a doctor as support for her accommodation claim—arguably unusual (though not inexplicable) actions

---

[2] Contrary to Jennette's suggestion, the mere fact that HACB has not produced contemporaneous internal documentation of its layoff decision-making process is not meaningfully probative of pretext, in the absence of any showing that it was unusual for such documentation to be lacking. Inconsistencies in explaining the decision-making process, however, may be probative of pretext. In addition, the lack of contemporaneous documentation— or, more precisely, documentation predating Jennette's communication of her medical condition—also limits HACB's ability to rebut Jennette's claim that the timing of the layoff is evidence of pretext.
[3] According to Stewart, Miller was working between New Haven and Bridgeport.

for Stewart to have taken if, as Stewart's deposition suggests, the process of deciding whether to lay off Jennette was already in motion with Stewart's involvement.

HACB may have explanations that would resolve the potential inconsistencies, such as Stewart's explanation that she "told [Jennette] to bring a doctor's note in case Mr. Miller changed his mind or she was laid off and later re-called or re-hired into a different job position." Stewart Aff. ¶ 36. But a reasonable jury could reject those explanations, leaving inconsistencies from which pretext could be inferred. For example, the jury might infer that Stewart's deposition testimony about the June communication with Miller's New Haven assistant was fabricated in an effort to establish that the layoff decision predated Jennette's July 15 disclosure of her MS, or alternatively, that the statements in the affidavits about Stewart's non-involvement were fabricated in order to support Miller's claim that he never learned of Jennette's MS from Stewart. *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1422 (7th Cir. 1992) ("A jury's conclusion that an employer's reasons were pretextual can be supported by inconsistencies in or the unconvincing nature of the decisionmaker's testimony.") (cited with approval in *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001)).

Further, the record contains almost no countervailing evidence of an alternative explanation for why July 16 specifically was chosen—aside from mere coincidence, which is a possibility—to rebut the inference of pretext arising from the temporal proximity of the disclosure of Jennette's condition. Miller's affidavit offers no explanation why he ordered the layoff that day. In her deposition, Stewart said that Miller usually communicated his layoff decisions on Tuesdays or Wednesdays (July 16, 2013, being a Tuesday), Stewart Dep. at 20-21, but the record contains no explanation why July 16, as opposed to any other Tuesday or Wednesday, was chosen.

Finally, Jennette has offered some evidence that Miller's proffered rationale for selecting her to be laid off—namely, that Miranda was more skilled and efficient—is pretextual because, in light of Jennette's superior skill and efficiency, it is unlikely that Miller honestly believed that Miranda was more skilled and efficient. In her affidavit, Jennette details the duties that she and Miranda each had in the central office, as well as their respective abilities to perform those duties, and generally depicts her own role as more important than Miranda's. The defendants argue that this cannot create a genuine dispute because it is a subjective opinion. But Jennette offers more than a conclusory opinion. She provides specific details of which she had personal knowledge: for example, that Jennette was responsible for managing most correspondence to the central office, handling complaints from public housing residents, transcribing minutes of board meetings, and editing monthly reports, and that Miranda could not perform basic functions in Microsoft Word or Excel (and even telephoned Jennette for technical assistance after Jennette had been laid off) and had been entrusted only with short writing projects while Jennette was entrusted with more substantial documents. Jennette Aff. ¶¶ 9-16.

A reasonable jury may agree with Jennette's characterization of her skill and efficiency as being superior to Miranda's. Alone, this evidence is insufficient to create a genuine dispute of material fact as to whether Miller's stated rationale for choosing to lay off Jennette is pretextual, but it nonetheless makes progress towards creating a genuine dispute about pretext. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("An employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision. . . . When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an

employer . . . the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. . . . Nevertheless, just because the discrepancy . . . does not *on its own* have the strength to create a material issue of fact, that does not mean the discrepancy is stripped of all probative value.") (quotation marks omitted; emphasis added).

There is sufficient evidence for a jury to find that HACB's stated rationale for the decision to lay off Jennette is pretextual, and this is not the sort of case envisioned by *Reeves* in which, despite minimally sufficient evidence of pretext, there is "abundant and uncontroverted independent evidence that no discrimination had occurred." 530 U.S. at 148. HACB does not dispute that Jennette had no record of job performance issues, and it offers little more than Miller's conclusory opinion that Miranda was more skilled and efficient, which—while sufficient to shift the burden of production back to Jennette—does not eliminate the genuine dispute as to whether HACB discriminated against Jennette on the basis of her disability. Summary judgment is therefore DENIED as to Jennette's discriminatory termination claim.

### B.    Failure-to-Accommodate Claim

HACB has separately moved for summary judgment on Jennette's "failure to accommodate claim." Def.'s Br. at 12-14. To the extent that Jennette has alleged a failure-to-accommodate claim, separate from her discriminatory termination claim, the claim has been abandoned and, in any event, would fail as a matter of law.

Under the Rehabilitation Act, a plaintiff may sue an employee for failing to make reasonable accommodations, apart from a claim of discriminatory termination. *Compare* 42 U.S.C. § 12112(b)(5)(B) ("[T]he term 'discriminate against a qualified individual on the basis

of disability' includes . . . denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant . . . .") *with id.* § 12112(b)(5)(A) ("[T]he term . . . includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . ."). [4] And the operative complaint in this case contains allegations suggesting that Jennette initially made such a claim. *See* Compl. ¶ 58 ("The defendant violated the provisions of the Rehabilitation Act by refusing to enter into a discourse regarding the reasonable accommodations needed by the plaintiff, [and] by not providing the plaintiff with reasonable accommodations . . . ."); *id.* ¶¶ 19, 21 (alleging that Jennette "informed Stewart that she suffered from multiple sclerosis, and that she would need for [sic] an accommodation with respect to the standing at a copy machine for one full day per week," but "Stewart did not enter into a discourse of any kind . . . to identify an appropriate accommodation").

But in opposing the motion for summary judgment, Jennette has abandoned that claim. She does not respond to HACB's motion with regard to a separate claim for failure to

---

[4] These portions of the Americans with Disabilities Act apply to Jennette's Rehabilitation Act claim. 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 *et seq.*) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment."). "[A] plaintiff can establish a *prima facie* case [for failure to accommodate] under [the Rehabilitation Act] by showing (1) that he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." *Stone v. City of Mount Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997).

accommodate, and instead discusses accommodation only in relation to her discriminatory termination claim.

Further, the record in this case forecloses a separate failure-to-accommodate claim. Federal regulations provide, in pertinent part, that "[t]he term reasonable accommodation means . . . [m]odifications or adjustments . . . that enable an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii),(iii). The potential accommodation at issue relates to Jennette's participation in the special file transfer project without having to stand at the copy machine all day. Jennette does not allege, much less provide evidence, that the requested accommodation would have enabled her to perform essential functions.[5] Nor does the record contain any suggestion that being excluded from the special file transfer project deprived her of the equal benefits and privileges of employment.

Because the file transfer project was undisputedly nonessential, HACB was legally prohibited from taking adverse action against Jennette because of her inability to participate in the project or in retaliation for her request for an accommodation—which the Court has already addressed, *supra* Section IV.A—but was not legally obligated to provide an accommodation in relation to the project. *See, e.g.*, *Stoffan v. S. New England Tel. Co.*, 4 F.Supp.3d 364, 376-77 (D. Conn. 2014) ("With respect to the plaintiff's request that he not be transferred to Stamford because it involved a longer commute, the plaintiff has not shown that he was unable to

---

[5] Compl. ¶ 16 ("Despite her impairment, the plaintiff had been able to successfully perform the essential functions of her position without an accommodation."); *id.* ¶ 24 ("Standing at a copy machine and making copies the full day was *not* an essential function of the plaintiff's job as Executive Secretary.") (emphasis added); Pl.'s D. Conn. L. R. 56(a)(2) Statement ¶ 4 (admitting defendant's claim that the plaintiff "was able to perform all of the essential duties of her position as secretary to the Executive Director of HACB without an accommodation"); Jennette Dep. at 96 ("Q: Did you ever request any accommodations so that you could perform any essential functions of your former position at the authority? A: No.").

perform the essential functions of his job in Stamford . . . . Thus, there is no genuine dispute as to whether the plaintiff was able to perform the essential functions of his position without an accommodation, and therefore the defendant was under no duty to agree to the plaintiff's request that he not be transferred to Stamford."); *Castro v. City of New York*, 24 F.Supp.3d 250, 267-68 (E.D.N.Y. 2014) ("[P]laintiff points to no evidence that would demonstrate that this request was made in an effort to enable him to better perform the essential functions of his job."); *Konieczny v. New York State Div. of Parole*, 647 F. Supp. 2d 256, 264 (W.D.N.Y. 2009) ("[T]he record demonstrates that the 'accommodations' she was allegedly denied—a flexible schedule and/or overtime—were not reasonable, because they were not necessary for her to perform the essential functions of her position.").

Thus, even if Jennette had not abandoned a separate failure-to-accommodate claim, summary judgment would be appropriate. The Court GRANTS summary judgment as to any claim that HACB failed in its duty to provide reasonable accommodations.

## V.    Conclusion

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 20) is GRANTED IN PART AND DENIED IN PART. The case proceeds only as to the plaintiff's claim that the defendant discriminated against her on the basis of her disability when it terminated her employment.

The parties' joint trial memorandum is due September 1, 2015, and jury selection is scheduled for November 4, 2015. If the parties wish to engage in a mediation with a magistrate judge, they should jointly file a statement on or before May 26, 2015, certifying that (1) counsel have conferred with their clients and each other, (2) the parties wish to proceed to mediation, (3) the parties are willing to participate in settlement efforts in good faith, and (4)

counsel believe that a mediation stands at least a reasonable chance of resolving the case without trial.

**SO ORDERED** this 18th day of May 2015, at Hartford, Connecticut.

>    /s/
> Michael P. Shea
> United States District Judge